**Glenda L. NORMAN, Appellant (Defendant Below),**

v.

**STATE of Indiana, Appellee (Plaintiff Below).**

No. 02S00–8807–CR–691.

Supreme Court of Indiana.

June 16, 1989.

Donald C. Swanson, Jr., Swanson & Campbell, Fort Wayne, for appellant.

Linley E. Pearson, Atty. Gen., Preston W. Black, Deputy Atty. Gen., Indianapolis, for appellee.

PIVARNIK, Justice.

Following a jury trial in Allen County Superior Court Defendant–Appellant Glenda L. Norman was found guilty by a jury of the crime of Murder and was sentenced to a term of forty (40) years.

The single issue presented for review in this direct appeal is Norman's claim there was insufficient evidence of probative value to support beyond a reasonable doubt

that Norman intended to murder the victim.

The evidence most favorable to the State shows that on September 29, 1987 Norman went to the Fort Wayne Police Department and asked to speak with Officer Steven Schulien, a family friend since 1969. Detective Schulien met with Norman at about 11:40 a.m. and she stated: "I think I shot Phillip." She also said: "I saw some blood," and "I'd like to make sure." Phillip was the victim's estranged husband, Phillip Norman. He lived at 2502 Nuttman, Fort Wayne, while he was recovering from a broken hip. Officer Schulien, Norman, and another detective went to the victim's house and found his body on the living room floor. After Officer Schulien had advised Norman of her rights and she indicated she understood them and was willing to talk to him, she admitted she had shot the victim several times. She said that on the prior evening she went to the victim's residence to discuss legal proceedings involving their son. An argument ensued and the victim pointed a rifle at her and then set it down. She stated the victim said he had a .45 caliber handgun in the chair with him. The argument heated up again and she saw him reach in the chair at what she thought was the handgun so she pulled a .25 caliber automatic from her purse and shot him. She told Schulien the victim fell to the floor and asked her to help him but she ran out the door and drove back to Fort Wayne where she threw the gun off the Taylor Street bridge.

Norman later talked to Officer Ronald Firks and told him substantially the same story. About a month later Norman provided in writing another statement to an investigator from the Public Defender's office in which she added more details to the story such as the location of blood spatters.

An autopsy showed the victim died from multiple gunshot wounds caused from .25 caliber, copper jacketed bullets. Five gunshot wounds were found on the victim's body. Two of the wounds were on his face, other wounds were found in his shoulder, armpit, and chest. Three bullets were removed from the victim's body. Three other bullets were found at the scene of the murder, indicating a total of six shots had been fired. Five shell casings were found scattered throughout the room indicating the shots had come from different points in the room.

About six months after the event, Norman began telling a different story. She told the second version to a nurse at the Allen County Jail and to Detective Lapp, and further testified to the second version at trial. The second version was that she had gone to a truck stop to sell sexual favors to truck drivers because she needed money. She said she made arrangements with a truck driver she knew only by his CB name, "Windjammer." She had sexual relations with "Windjammer" for pay and they then went to several bars. She said her husband had been a dealer and police informant in drugs and she took "Windjammer" to his home to buy marijuana. During the course of the evening she had given her .25 caliber automatic to "Windjammer" to carry for her. She waited in the car while "Windjammer" made a marijuana transaction with her husband. "Windjammer" came running out rather hurriedly and said he had a problem with Phillip. They stopped the car at the Taylor Street bridge and "Windjammer" threw the .25 automatic off the bridge. She stated she did not tell this second version earlier because she did not want her live-in boyfriend to know about her liaison with "Windjammer."

■ Norman maintains there was insufficient evidence to support the jury's verdict as a matter of law that it was her conscious objective to kill the victim, or that she was aware of a high probability that death would result at the time of the shooting. She concedes that, when reviewing sufficiency claims, this Court does not reweigh evidence or judge credibility. It considers only the evidence most favorable to the judgment of the trial court and reasonable inferences to be drawn therefrom. If there is substantial evidence of probative value from which the trier of fact might reasonably infer guilt beyond a reasonable doubt, the conviction must stand. *Cole-*

*man v. State* (1986), Ind., 490 N.E.2d 711. Norman properly states the standard of review on such an issue. While conceding this standard, Norman claims that where, as here, the conviction is based solely on the testimony of an inherently unbelievable witness, or where such testimony is replete with "incredible dubiosity" the conviction may not stand, citing *Hill v. State* (1986), Ind., 497 N.E.2d 1061, 1064. In *Hill*, this Court upheld a murder conviction finding the testimony of three independent eyewitnesses provided sufficient evidence although minor and unimportant discrepancies between descriptions existed. *Id.*

Norman distinguishes *Hill*, claiming the only direct evidence linking her in any way to the charged crimes are her pre-arrest statements which she claims were made directly out of fear of the vindictiveness of her boyfriend and which were materially contradicted by her testimony at trial. Interestingly, Norman argues "incredible dubiosity" in her own testimony presented as a second version of what happened at the victim's house, which she now abandons in claiming a lack of showing of intent in the shooting she described in the original version.

 The necessary intent to commit murder may be inferred from the circumstances of the acts involved. *Allen v. State* (1986), Ind., 496 N.E.2d 53, 54. The deliberate use of a deadly weapon in a manner likely to cause death is such a circumstance. *LaMotte v. State* (1986), Ind., 495 N.E.2d 729, 731. The jury heard both versions of the events and further heard her explanation for changing her story. They also heard testimony that reasonably inferred Norman fired six shots at the victim because three bullets were found in his body and three bullets were found at the scene. The victim's body had five bullet wounds, two in the mouth area, one in the shoulder, and two other wounds to the chest and upper body. Five bullet casings were found throughout the room. All of the casings had been fired from the same gun. The jury could have reasonably inferred from this evidence that Norman repeatedly shot the victim as she walked across the room with the intent to kill him. Norman admitted on at least four occasions she shot the victim and admitted to Officer Schulien that she left the victim to die despite his pleas for help. The jury also had the opportunity to observe Norman's demeanor while testifying. The evidence in this case did not consist of uncorroborated evidence of "incredible dubiosity." Norman's credibility was before the jury, along with other circumstantial evidence related above, which constituted adequate probative evidence supporting the jury's verdict. *See Elliott v. State* (1984), Ind., 465 N.E.2d 707, 709; *Gaddis v. State* (1969), 253 Ind. 73, 80, 251 N.E.2d 658, 661–62.

The trial court is affirmed.

SHEPARD, C.J., and DeBRULER, GIVAN and DICKSON, JJ., concur.